LISA RICCI,
     Plaintiff,

     v.

     No. 3:16-cv-01161 (SRU)

NANCY A. BERRYHILL[1],
Commissioner of Social Security,
     Defendant.

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Lisa Ricci moves to reverse the decision by the

Social Security Administration (SSA) denying her disability insurance benefits. The

Commissioner of Social Security moves to affirm the decision. I conclude that Ricci's arguments

for reversal lack merit and that the Administrative Law Judge (ALJ)'s decision that Ricci could

perform other work was supported by substantial evidence. Therefore, I grant the

Commissioner's motion and deny Ricci's.

## I.     Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill has been automatically substituted as defendant for Carolyn W. Colvin, because Carolyn W. Colvin has ceased to hold the office of Acting Commissioner of Social Security. The Clerk is directed to amend the case caption.

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc.*

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Lisa Ricci applied for Social Security disability insurance benefits on May 22, 2012, alleging a period of disability beginning May 1, 2010. *See* ALJ Hearing Decision, R. at 10. Ricci identified her disability as being due to the following illnesses and conditions: anxiety, post-traumatic stress disorder, bleeding ulcers from stress, and depression. *See* Disability Determination Explanation (Initial), R. at 92.

The SSA initially denied Ricci's claim on March 27, 2015, finding that although Ricci has severe impairments, she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the [required] listed impairments", as defined in 20 C.F.R. § 404, to receive Social Security disability insurance benefits. *See* ALJ Hearing Decision, R. at 13. In the agency's view, Ricci "has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b): She is limited to simple instructions, and

routine and repetitive tasks, and to occasional interact[ions] with co-workers, supervisors, and the general public." *Id.* at 15.

Ricci requested a hearing with an ALJ. *Id.* at 10. The hearing was held on September 25, 2014. Tr. of ALJ Hr'g, R. at 29. At the hearing, ALJ Robert DiBiccaro questioned Ricci about her conditions and treatment history, particularly asking about the physical requirements of manager of the clubhouse at Greenwich Country Club, her most recent job. *Id.* at 51–54. Ricci replied that her job required both office work and attending meetings, and that she was "in and out of the office." *Id.* at 52. The ALJ also asked Ricci generally about the "health issues" she was experiencing in 2004 and 2006 because noticed that her "salary went way down" during those years, based on her Social Security earning statement. *Id.* at 54–55. She replied that she suffered from both physical and mental health issues during that time, and that she was "dealing with [the physical issues] as best [she] could." *Id.* at 55.

Ricci also reported that currently, she needs to shift from a seated position to a standing position approximately every 15 to 20 minutes. *Id.* at 66, 72. She stated that she has difficulty climbing the stairs in her house. *Id.* at 67. She explained that she experiences panic attacks roughly three times per week, and that the panic attacks last between half an hour and two hours. *Id.* at 72–73.

Ricci's husband was present at the hearing but did not testify. ALJ Hearing Decision, R. at 10.

On March 27, 2015, the ALJ issued an opinion in which he found that Ricci "has not been under a disability, as defined in the Social Security Act, from May 1, 2010, through the date of this decision (20 C.F.R. § 404.1520(g))." *Id.* at 21.

At the first step, the ALJ found that "there has been a continuous 12-month period[] during which [Ricci] did not engage in substantial gainful activity." *Id.* at 13.[2] At the second step, the ALJ found that Ricci's "depressive disorder…chronic pain syndrome; alcohol dependence; [and] grade 1 spondylisthesis of the lumbar spine at L4-5 with stenosis" were "severe impairments" under 20 C.F.R. § 404.1520(c). *Id.*[3] At the third step, the ALJ determined that Ricci's impairments were not per se disabling because Ricci "d[id] not have an impairment or combination of impairments that me[t] or medically equal[ed a] listed impairment." *Id.*

The ALJ then assessed Ricci's residual functional capacity, and found that she could "perform light work," with certain limitations. *Id.* at 15. Those limitations were that Ricci (1) could follow only "simple instructions," (2) could complete only "routine and repetitive tasks," and (3) could interact occasionally "with co-workers, supervisors, and the general public." *Id.* at 15.

Although Ricci's residual functional capacity precluded performance of her past relevant work, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Ricci] c[ould] perform." *Id.* at 20–21. The ALJ based that decision on Ricci's residual functional capacity in conjunction with the Medical-Vocational Guidelines and determined that a finding of "not disabled" was therefore appropriate under the framework of the Medical-Vocational rules. *Id.* at 21. The ALJ denied Ricci's request for disability benefits. *Id.*

Ricci requested a review of the ALJ's decision by the SSA's Appeals Council on April

---

[2] The ALJ noted that Ricci "engaged in substantial gainful activity through the first quarter of 2012" but that the "remaining findings address the period…[that Ricci] did not engage in substantial gainful activity." ALJ Hearing Decision, R. at 13.

[3] The ALJ found that Ricci lacks an impairment "that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§  404.1520(d), 404.

23, 2015. Request for Review of Hearing Decision/Order, R. at 5. Holding that there was "no reason . . . to review the [ALJ]'s decision," the Appeals Counsel "denied [Ricci's] request for review" on May 20, 2016. Notice of Appeals Council Action, R. at 1. Ricci then filed a complaint with this court urging reversal of the Commissioner's decision on July 12, 2016. Compl., Doc. No. 1.

## III.   Discussion

On review, Ricci asserts that the ALJ made the following errors: (1) he "failed to give proper weight to the opinions of [] Ricci's treating physician," (2) "failed to properly determine [] Ricci's Residual Functional Capacity, (3) did not properly secure testimony from a vocational expert and failed to meet Defendant's burden of proof by showing the existence of jobs in Connecticut that Ricci could perform given her functional limitations, and (4) failed to provide Ricci with a full and fair hearing in violation of her due process rights. Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 2. The Commissioner responds that the ALJ's "decision is supported by substantial evidence and complies with the applicable legal standards," and should be affirmed. Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 15.

### A.   Did the ALJ correctly evaluate the medical opinion evidence?

Ricci challenges the ALJ's treatment of the medical opinion evidence on two fronts. First, she argues that the ALJ gave "more weight to non-treating and non-examining physicians" than to "a long-time treating physician, whose opinions are internally consistent and consistent with reports from other doctors" and other sources. Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 10. Second, Ricci argues that the ALJ should have contacted the long-time treating physician for a second time and obtained interrogatories from that physician before discounting her opinion.

*Id.* at 8. The Commissioner responds that "the ALJ properly found that the record did not support the severe limitations included in Dr. Pincus's opinion with respect to physical impairments, and his assignment of little weight to that opinion is supported by substantial evidence." Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 9. The Commissioner also responds that because the ALJ developed the record and found that it was "sufficient to determine that [Ricci] was not disabled under the Act…the ALJ had no further duty to develop the record. *Id.* at 11. With regard to both sets of opinions, I affirm the ALJ's ruling.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[4] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned, *Burgess*, 537 F.3d at 129. But

---

[4] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"where the ALJ's reasoning and adherence to the regulation are clear," the ALJ need not "slavish[ly] recite[] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence" that, if it "contradict[s]" the opinion of a treating physician, renders the latter "not binding." *See Mongeur*, 722 F.2d at 1039; *see also Prince*, 490 F. App'x at 401 ("[C]onsultative examinations were still rightly weighed as medical evidence."); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The report of a consultative physician may constitute . . . substantial evidence."). The question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians—Dr. Honeychurch and Dr. Bangs—more heavily than the opinions of Ricci's treating physician, Dr. Pincus, and Diane Sheehan. *See Burgess*, 537 F.3d at 129.

The ALJ gave "some weight to the State agency medical and psychological consultants" but noted that those consultants did not address Ricci's "lumbar spine issue or chronic pain syndrome," which the ALJ found would limit Ricci to light work. ALJ Decision, R. at 19. The ALJ agreed with the consultants' decision to limit Ricci to "simple work" but disagreed with their suggested limitation of "no work with the public" because the ALJ found evidence that Ricci "related well to her clinicians, even when they delivered unpleasant news" and that she was

"able to occasionally interact with others" even though she had "some difficulty interacting with her husband." *Id*.

The ALJ "adopted the portion of [Dr. Pincus' physical medical source statement] limiting [Ricci's] exposure to unprotected heights due to the reported side effects of Dilaudid." *Id*. However, he assigned "[l]ittle weight" to Dr. Pincus' mental medical source statement because "she is not a mental health specialist" and because "the assessment does not support her treatment notes from the same time period." *Id*. In addition, "Dr. Pincus found no limits in [Ricci's] ability to understand simple instructions" and found that "she was not significantly limited with understanding detailed instructions." *Id*. Furthermore, "Dr. Pincus found only moderate limitations in the area of social functioning, which is generally consistent with the mental residual functional capacity findings made in this decision, limiting the claimant to simple work with occasional interaction with others." *Id.*

The ALJ gave little weight to Dr. Pincus' physical medical source statement because he determined that "it is not supported by the treatment records." *Id*. The ALJ noted that Dr. Pincus found that Ricci's ability to bend was improving in January 2014, and Dr. Pincus did not provide support for limitations of sitting, standing, and walking. *Id.* Furthermore, the ALJ noted that Ricci had reported to Dr. Pincus that she was walking her dog, leaving the house, and cooking dinner. *Id*. (referring to Treatment Records, dated 04/22/2014 to 09/29/2014, from Old Greenwich Medical Group, R. at 813–37).

The ALJ also gave "little weight" to Diane Sheehan, licensed professional counselor, noting "the incomplete medical source statement" that Sheehan submitted, "which was co-signed by a medical doctor" but which indicated "unable to assess" for most answers. *Id*. (referring to Medical Evidence of Record, dated 10/12/2012, from F S Dubois Center, R. at 488–491).

Therefore, the ALJ found that Sheehan's opinion was "incomplete and offer[ed] no probative value." *Id.*

The inconsistencies among the opinions of Dr. Pincus and Diana Sheehan, on the one hand, and their treatment notes and the opinions of other physicians, on the other, presented a "[g]enuine conflict[] in the medical evidence . . . for the Commissioner to resolve." *See Burgess*, 537 F.3d at 128. As the Second Circuit recently held, where a doctor's opinion is "in conflict with content in that doctor's own clinical notes, and in conflict with the opinion of [other physicians]," those factors "constitute 'good reasons' for the limited weight attributed." *Camille v. Colvin*, 562 F. App'x 25, 27 (2d Cir. 2016) (summary order). Furthermore, even if "the record contains evidence" that might support Dr. Pincus' opinions, it also "contains substantial evidence supporting the conclusion[s]" drawn by the other treating physicians and by the ALJ. *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 76 (2d Cir. 2012) (summary order). Because "[i]t is not [my] function to determine *de novo* whether [Ricci] is disabled," *Brault*, 683 F.3d at 447, nor "to resolve evidentiary conflicts" in the record, *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), I cannot quarrel with the ALJ's decision not to give controlling weight to Dr. Pincus' and Diane Sheehan's opinions.

For the same reasons, I conclude that—after he decided not to give Dr. Pincus' and Diane Sheehan's opinions controlling weight—ALJ DiBiccaro properly evaluated the persuasiveness of the opinions under the factors listed in 20 C.F.R. § 404.1527(c)(2)–(6). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013). Here, the ALJ was sufficiently specific in writing that Dr. Pincus' mental medical source opinions were not credible because "she is not a mental health specialist" and because "the

assessment does not support her treatment notes from the same time period, where she indicated that [Ricci] was walking her dog, leaving the house, and cooking dinner." ALJ Decision, R. at 19. The ALJ was also specific when he wrote that Dr. Pincus' physical medical source statement was "not supported by the treatment records" and that Diane Sheehan's opinion was "incomplete" and offered "no probative value." *Id.*; *Camille*, 562 F. App'x at 28 ("The ALJ was permitted to consider Dr. [Pincus and Diane Sheehan's] treatment notes in weighing the opinions of Dr. [Pincus] and [the other sources]; and []he was permitted to conclude that [the other doctors'] opinions w[ere] more reliable."). Hence, the ALJ did not err with regard to his treatment of the doctors' medical opinions.

B. Was the ALJ's residual functional capacity determination supported by substantial evidence?

Ricci argues that the ALJ's residual functional capacity determination was not supported by substantial evidence because "the ALJ failed to incorporate the limitations described by [] Ricci's providers in his RFC description." Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 11.

In particular, Ricci asserts that ALJ's decision to limit Ricci to "simple instructions, and routine repetitive tasks" does not "accurately reflect her limitation as described by Dr. Pincus." *Id.* Ricci argues that "[t]he ALJ should have included [] Ricci's restrictions as described by Dr. Pincus, in his RFC determination." *Id.* Ricci also argues that an RFC determination "must also incorporate a claimant's statements" and therefore "the ALJ should have included in his RFC determination [] Ricci's inability to sit and stand for extensive periods of time, and as a result should have limited her to less than a full range of sedentary work." *Id.* at 12. The Commissioner responds that the ALJ gave little weight to Dr. Pincus' opinions for the same reasons as discussed in the previous sections and "was not required to include greater limitations in his RFC

as a result of Dr. Pincus' opinions." Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 12. Furthermore, the Commissioner responds that "an ALJ is not required to incorporate all of [Ricci's] subjective complaints in the RFC determination." *Id*. The Commissioner asserts that the ALJ found that Ricci was "not entirely credible," and properly rejected her subjective complaints except where supported by the record and already incorporated in the RFC determination. *Id.* at 12–13. I agree with the Commissioner, and therefore find no error with respect to the ALJ's residual functional capacity findings.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] . . . finding that [is] consistent with the record as a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

12

In making a residual functional capacity determination in the present case, ALJ DiBiccaro extensively considered Ricci's complaints as well as her voluminous medical records. ALJ Decision, R. at 15–20. He determined that although the record reflects that [Ricci] has had extensive issues with alcohol and some difficulty adhering to narcotic contracts, he found that "[t]he longitudinal medical record is not supportive of [Ricci's] allegations [that she cannot work because of a combination of physical and mental limitations], to the degree she has alleged." *Id.* at 17.

The ALJ determined that Ricci "is not actively engaged in mental health treatment, despite her allegations of debilitating panic attacks" for several reasons: (1) her attorney did not provide updated records of her visits to the Dubois Center, where Ricci had some treatment before November 20120, (2) because she canceled an appointment at Southwest Community Health Center for May 2014, and (3) because she only visited the Southwest Community Health Center twice before May 2014, when she canceled her appointment. *Id.* at 18.

Furthermore, he noted that although psychiatrists diagnosed her with a variety of illnesses, Ricci has not been diagnosed with an anxiety disorder. *Id.* at 17. He noted that in March 2013, Dr. Carlson, a psychiatrist, diagnosed Ricci with alcohol abuse, nicotine dependence, and depressive disorder, but ruled out an anxiety disorder. *Id.* at 17 (referring to Medical Records, dated 01/11/2013 to 03/07/2013, from FS Dubois Center, R. at 613–40). Another psychiatrist, Dr. Knox, had seen Ricci in February 2012 and diagnosed her with depressive disorder and alcohol dependence. *Id.* at 18.

Ricci's primary care physician, Dr. Pincus, diagnosed Ricci with chronic pain syndrome and depressive disorder. *Id.* at 18 (referring to Medical Records, dated 06/23/2010 to 03/12/2012, form Jayne F. Pincus MD, R. at 267). He noted that the nurse practitioner who treated Ricci for

13

lower back pain with sciatica, Julie Waight, took treatment notes that were "replete with instances of alcohol use and with taking more narcotics than have been prescribed." *Id.* at 17.

The ALJ determined that Ricci had minimized her alcohol use at the ALJ hearing. *Id*. at 17. The ALJ wrote that in 2013, Ricci self-reported that she had been "drinking heavily for two years." *Id.* at 17 (referring to Medical Records, dated 12/18/2012 to 11/18/2013, from Connecticut Spine Institute/Greenwich Neurosurgery, R. at 743). However, when Diane Sheehan, a licensed professional counselor, saw Ricci in Sheehan's office in July 2012, Ricci was "well-groomed and well-dressed," and indicated to Sheehan that she had "reduced her alcohol use and had entered an exercise program. *Id.* at 17 (referring to Crisis Evaluations, dated 07/23/2012 to 08/15/2012, from Southwest Community Mental Health, R. at 419–34). In 2014, Ricci reported that her depression was better and that she had been more active. *Id.* at 18. In addition, in 2014 Dr. Pincus' treatment notes indicated that Ricci had improved. *Id*. at 18.

Regarding Ricci's own testimony, ALJ DiBicarro noted that her credibility was diminished for several reasons: she testified that "panic symptoms were her most debilitating impairment and the primary reason she could not work" but that there was "very little in the record" to support those claims, including the lack of anxiety disorder diagnosis. *Id*. at 20.[5] In addition, the ALJ noted that Ricci has improved, and reported fewer panic symptoms in 2014. *Id*. He found no "indication" that Ricci "is having consistent panic attacks three times per week." *Id*. The ALJ stated that he was "not persuaded" by Ricci's testimony that she could not find mental health clinicians through her insurance because, he observed, she has seen multiple clinicians

---

[5] At several points in the record, there are notes of an examination or service provided by Julie Waight, a nurse practitioner, whose notes list as "diagnosis," among other things, anxiety. Notwithstanding that notation, the treatment notes do not mention a discussion, complaint, or treatment of anxiety. *See, e.g.,* Medical Records, dated 01/14/2012 to 05/31/2012, R. at 370.

through Southwest Mental Health and the Dubois Center. *Id.* Furthermore, the ALJ noted inconsistencies between Ricci's denial of heavy alcohol use at her hearing, where she stated that she drank only occasionally, and the evidence in the record of ongoing alcohol use. *Id.* Given that Ricci "has had issues related to violating narcotics contracts and taking medications not prescribed to her" the ALJ found that those issues "reflect poorly on her credibility." *Id.* Given that Ricci reported improvement in her pain symptoms and Dr. Pincus reported that she could bend more easily and was almost back to baseline, and that she was making dinner nightly and walking her dog, the ALJ found that Ricci could perform light, unskilled work, with occasional interactions with the public. *Id.*

Hence, the ALJ correctly "t[ook] the claimant's reports of pain and other limitations into account" and "exercise[d] discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). He did not, and "[was] not required to[,] accept the claimant's subjective complaints without question." *Id.*; *cf. Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (summary order) ("treating physician's opinions . . . based upon plaintiff's subjective complaints of pain and unremarkable objective tests" were "not 'well supported by medically acceptable clinical and laboratory diagnostic techniques'" and not entitled to "controlling weight") (citing 20 C.F.R. §§ 404.1527(d)(2) , 416.927(d)(2)); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the court] must defer to his findings.").

In short, Ricci's case presented a significant quantity of conflicting medical and opinion evidence, with doctors who disagreed on the nature, severity, and cause of her symptoms.

Because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," the ALJ was entitled to "choose between properly submitted medical opinions" and to consider "other substantial evidence in the record" in determining Ricci's residual functional capacity. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). ALJ DiBiccaro held that Ricci "has the residual functional capacity to perform light work" and limited her to "simple instructions, and routine and repetitive tasks, and to occasional interact[ions] with co-workers, supervisors, and the general public." ALJ Decision, R. at 15. In crafting those limitations, the ALJ relied on substantial evidence in the form of Ricci's testimony, *id.* at 20, "diagnostic testing," *id.* at 17–18, "[t]reatment notes," *id.* at 17–18, and "opinions" by consultative and examining physicians. *Id.* at 19–20.

Ricci nevertheless objects to the ALJ's decision to limit Ricci to "simple instructions, and routine repetitive tasks" because she argues that the limitation does not "accurately reflect her limitation as described by Dr. Pincus." Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 11. Ricci argues that "[t]he ALJ should have included [Ricci's] restrictions as described by Dr. Pincus" and should have taken into account Ricci's "inability to sit and stand for extensive periods of time, and as a result should have limited her to less than a full range of sedentary work." *Id.* at 11–12. Those criticisms, however, simply reflect Ricci's disagreement with the relative weight the ALJ placed on her evidence of limitations. "[O]nce an ALJ finds facts, [I] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted). Here, I hold that a reasonable factfinder need not conclude that Ricci requires limitations for "inability to sit and stand for extensive periods of time." Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 11. Ricci testified that the Dilaudid medication was "99%

helpful" and that Dr. Pincus' treatment notes from 2014 reflect improvement in Ricci's ability to bend over and drive and state that she is "almost back to baseline." I find no error with respect to the ALJ's findings in those respects. *See* ALJ Decision, R. at 18.

Under that "very deferential standard of review," I consider the ALJ's residual functional capacity finding to have been based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 448; *Greek*, 802 F.3d at 375. Therefore, because "there is substantial evidence to support the determination," I find no error with respect to the ALJ's decision on that point. *See Selian*, 708 F.3d at 417.

C. <u>Was the ALJ's step five determination supported by substantial evidence?</u>

Ricci argues that because she has significant non-exertional limitations, the ALJ should have secured testimony from a Vocational Expert. Mem. Supp. Mot. Reverse, Doc. No. 15-1, at 13. The Commissioner responds that all but one of the basic mental requirements of unskilled work are met, and that skill – responding appropriately to supervision, coworkers, and usual work situations – is only "slightly restricted" by limiting Ricci to "occasional interactions with others." Accordingly, the Commissioner argues that the ALJ "addressed this issue and properly held that the additional limitations would have 'little or no effect on the occupational base of unskilled light work.'" Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 15.

After a claimant has proved that his or her residual functional capacity precludes a return to "past relevant work," *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work in the national economy that the claimant can do." *Poupore*, 566 F.3d at 306. Ordinarily, the ALJ may carry that burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).

However, in cases where both exertional and nonexertional limitations are present, "the guidelines cannot provide the exclusive framework for making a disability determination." *Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir. 1986). The Second Circuit has held in such cases "that application of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis." *Id.* Where the guidelines "adequately reflect a claimant's condition…their use to determine disability status is appropriate." *Id.* If, on the other hand, the range of work that a claimant can perform is "significantly diminished" then vocational testimony is required." *Id.*

The ALJ found that Ricci had the RFC to perform light work with the following nonexertional limitation: occasional interactions with others. *See* ALJ Decision, R. at 15. The ALJ then considered Ricci's RFC together with her vocational age profile (younger individual, subsequently changing to closely approaching advanced age), education (limited education), and work experience (transferability of skills was not material), and used Grid Rules 202.18 and 202.11 as a framework to conclude that Ricci was not disabled. *Id.* at 21.

The mental activities "generally required by competitive, renumerative, unskilled work" include: (1) "[u]nderstanding, remembering, and carrying out simple instructions", (2) "[m]aking judgments that are commensurate with the functions of unskilled work--i.e., simple work-related decisions", (3) "[r]esponding appropriately to supervision, co-workers and usual work situations", and (4) "[d]ealing with changes in a routine work setting." *Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work*, SSR 96-9 (S.S.A. July 2, 1996). Social Security Ruling 85-15 states that "unskilled jobs at all levels of exertion…ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to

meet the intellectual and emotional demands of such jobs on a sustained basis." SSR 85-15, 1985 WL 56857, at *4.

Here, the ALJ conducted the required analysis, finding that "the additional limitations have little or no effect on the occupational base of unskilled light work." ALJ Decision, R. at 21. A finding of "not disabled" is therefore appropriate. Social Security Ruling 96-9p, indicates that the sedentary occupational base is not significantly eroded if an individual retains the ability to hear and understand simple oral instructions or to communicate simple information. Ricci certainly retains at least those abilities. Because the ALJ analyzed whether Ricci's nonexertional impairments "significantly eroded" her occupational base, and found that they had "little or no effect," he did "not commit legal error by relying on the Grid in making his determination and not obtaining the testimony of a vocational expert." *Howe v. Colvin*, 2013 WL 4534940 at *18 (S.D.N.Y. Aug. 27, 2013) (agreeing with report finding that ALJ did not err when using the Grid and finding claimant's nonexertional limitations had "little or no effect on the occupational base of unskilled sedentary work"); *see also Wasiewicz v. Colvin*, 2014 WL 5465451 at *6 (W.D.N.Y. Oct. 28, 2014) (finding no error where claimant retained RFC for light work with no more than occasional contact with public, coworkers, or supervisors and ALJ relied on Grids).

Similarly, here, the guidelines "adequately reflect" Ricci's condition. *See Bapp*, 802 F.2d at 605–06. Thus, a vocational expert was not needed in this case, and the ALJ did not err by relying on the Grid to make his determination. The decision of the ALJ is supported by substantial evidence.

## IV.    Conclusion

I grant the Commissioner's motion to affirm, and deny Ricci's motion to reverse. The

Clerk shall enter judgment and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 29th day of March 2018.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge